David S. Casey, Jr. (SBN 60768)
Gayle M. Blatt (SBN 122048)
P. Camille Guerra (SBN 326546)
Jennifer L. Connor (SBN 241480)
**CASEY GERRY**
**FRANCAVILLA BLATT LLP**
110 Laurel Street
San Diego, CA 92101
Tel: (619) 238-1811
dcasey@cglaw.com
gmb@cglaw.com
camille@cglaw.com
jconnor@cglaw.com

*Attorneys for Plaintiffs and the Proposed Class(es)*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION**

J.T. AND E.H., individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

CALIFORNIA PHYSICIANS' SERVICE, doing business as, BLUE SHIELD OF CALIFORNIA,

Defendant.

Case No. 3:25-cv-04343

**CLASS ACTION**

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs J.T. and E.H. ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendant California Physicians' Service doing business as Blue Shield of California ("BSC" or "Defendant"), and allege the following upon information and belief, except as to allegations concerning Plaintiffs themselves and their actions, which are alleged upon personal knowledge:

## I. INTRODUCTION

1. Defendant California Physicians' Service, which operates as Blue Shield of California, is based in Oakland, California and is one of the largest insurers in the state and provides health insurance products and services to more than 4.7 million members.[1]

2. Defendant BSC operates a website with multiple subpages, located at www.blueshieldca.com, along with a corresponding mobile application or "App" (together, the "Website") through which it communicates with prospective, current, and past health insured members and other consumers. Defendant encourages healthcare consumers to use this Website to, among other things: "Find a Doctor"; research medical symptoms and health issues (*e.g.*, "Maternity Health," "Mental Health & Substance Use Resources," "Diabetes Support," "Palliative Care," etc.); obtain information about insurance plans and benefits, including individualized policy holder details such as health services obtained, medications obtained, amounts paid for medical services and medication, and information about available benefits; access to a "24/7 Nurse Line" to communicate with nurses; and the ability to take other actions related to their personal health care. When doing this, healthcare consumers convey highly private information, including sensitive medical information, through the Website.

3. Plaintiffs and all other members of the proposed Class (defined *infra*) are health insurance policyholders and healthcare consumers who communicated with BSC through its Website. They shared information, including their Personally Identifiable Information ("PII") and Protected Health Information ("PHI"), (collectively, "PII/PHI"), with the reasonable belief that BSC would take appropriate steps to maintain the privacy of these communications.

---

[1] https://news.blueshieldca.com/2022/10/06/blue-shield-of-california-lawsuit-alleges-department-of-health-care-services-failed-to-produce-documents-in-medi-cal-procurement (last accessed May 20, 2025).

4. Instead, BSC violated Plaintiffs' and Class Members' trust because, without their knowledge or consent, Defendant embedded code on its Website that shared their PII/PHI with unrelated companies, including Google LLC (*vis-à-vis* Google Analytics and Google Ads), and potentially other marketing platforms and downstream third-party businesses.

5. BSC transmitted to third parties portions of Plaintiffs' and similarly situated consumers' private communications with it through pieces of tracking code that it embedded in its Website for purposes of sharing such information with marketing entities. This code served as real time wiretaps on patients' communications.

6. BSC's goal in installing the tracking code was not to provide any benefit to its patients but only to itself. BSC installed the tracking code to obtain insight about how its members and potential members use its Website.

7. By installing the tracking code, moreover, BSC enabled marketing entities to use members' PII/PHI to target them with advertising by yet other, unrelated businesses. By way of illustration, when Google Analytics is enabled on patient/member portal webpages, and when Google Ads is linked to Google Analytics, then Google Analytics can comb the personal information from that patient/member portal, link that information to Google's preexisting identifying information (*e.g.*, from Gmail and other Google account services), which then allows advertisers to target users with ads based on the information from the insurance portal.

8. BSC's conduct in sharing Plaintiffs' and Class Members' protected health information and other personally identifiable information violates an array of laws and duties. Plaintiffs thus sue individually on behalf of themselves and on behalf of Class Members who used Defendant's Website at any time when tracking code, via Google Analytics or otherwise, was enabled and shared data with third parties for website analytics, marketing, or any non-authorized purposes (the "Class" and as defined further *infra*), seeking remedies for: violation of federal wiretapping statutes (*i.e.*, Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.); violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq*.; violation of California's Confidentiality of Medical Information Act ("CMIA") Cal. Civ. Code § 56, *et seq*.; violation of the privacy rights protected by common law and California's Constitution; breach of BSC's implied contract with Plaintiffs and Class Members; violation of California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq*.; and other tortious acts as described herein.

## II. PARTIES

9. Plaintiff J.T. is a natural person and citizen of California, residing in San Diego. Plaintiff obtains health insurance from BSC and has done so for many years with intermittent gaps, and most recently for the last two years. Plaintiff J.T. regularly used Defendant's Website, www.blueshieldca.com, (in both the traditional desktop and mobile App formats) to obtain information about his health insurance benefits, including by accessing the Find-A-Doctor, 24/7 Nurse, and the BSC website search box. Plaintiff J.T. received the Notice of the Data Breach dated April 10, 2025.

10. Plaintiff E.H. is a natural person and citizen of California, residing in Clovis. Plaintiff E.H. obtained health insurance from Defendant BSC between January 2017 through January 2020. Plaintiff E.H. regularly used Defendant's Website, www.blueshieldca.com, (in both the traditional desktop and mobile App formats), to obtain information about her health insurance benefits, including by accessing the Member Login, Find-A-Doctor, Blue Shield Claims, and Payment portals. Plaintiff E.H. received the Notice of the Data Breach dated April 7, 2025.

11. As described below, BSC implemented tracking technologies that intercepted communications between BSC and healthcare consumers on nearly every page of Defendant's Website. The webpages Plaintiffs visited on the BSC Website were among the webpages on which BSC embedded code for various tracking technologies, including Google Analytics.

12. Plaintiffs did not consent or authorize the sharing and disclosure of their PII/PHI to third parties or for BSC enabling third parties to access and use such PII/PHI.

13. Defendant California Physicians' Service d/b/a Blue Shield of California is a mutual benefit corporation and health plan organized under California law with its primary place of business at 601 12th Street, Oakland, California.

## III. JURISDICTION AND VENUE

14. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this suit is brought under the laws of the United States (*i.e.*, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*.).

15. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy

exceeds the sum of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Class, and minimal diversity exists as Defendant is a citizen of states different from that of at least one Class Member.

16. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

17. This Court has personal jurisdiction over Defendant because, at all times relevant, Defendant was registered to do business in California with the California Secretary of State, and with its principal place of business located in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and because Defendant's principal place of business is located in this District.

## IV. FACTUAL BACKGROUND

19. Defendant California Physicians' Service doing business as Blue Shield of California (again, "Defendant" or "BSC") is a mutual benefit corporation and health plan, founded in 1939 by the California Medical Association. It is headquartered in Oakland, California and serves over 4.7 million health plan member and more than 65,000 physicians across the state. One of BSC's primary means of communication with its policyholders and consumers is through its website and related website subpages, www.blueshieldca.com, along with a mobile application or "app" (again "Website").

20. Defendant engaged in unauthorized data sharing by allowing Google Analytics and potentially other third-party tracking tools to intercept and transmit Plaintiffs' and other similarly situated users' PII/PHI to third parties without obtaining explicit consent. This data included sensitive personal identifiers such as IP addresses, browsing history (*e.g.*, including the URLs of visited pages and search terms entered on the website) and potentially health-related inquiries, which were then used by third parties for commercial purposes.

21. The data shared with third parties through Google Analytics included not only browsing patterns, but also potentially sensitive health-related information given the nature of BSC's

services. This unauthorized sharing exposed Plaintiffs and Class Members to risks such as identity theft and unauthorized profiling.

22. The involvement of Google Analytics in intercepting user data on BSC's Website was not limited to anonymous usage statistics. Instead, it involved the collection of identifiable information that was then used by third parties to create detailed user profiles. Defendant's data sharing practices with Google Analytics allowed third parties to associate users' online activities with their real-world identities. This association was facilitated through the use of unique identifiers such as cookies and IP addresses. This information was then used by third parties to tailor advertisements to users' perceived health needs.

23. The data sharing practices facilitated by Google Analytics on BSC's Website resulted in the unauthorized dissemination of Plaintiffs' and Class Members' private information to a network of third-party advertisers. This dissemination occurred without Plaintiffs' and Class Members' knowledge or consent, constituting a significant breach of privacy.

### A. Defendant's Notice of Data Breach

24. On April 04, 2025, BSC issued a Notice of Data Breach to insurance plan participants which stated, in part, as follows:

> We are writing to inform you about a potential data breach. It is reasonably believed that certain elements of your protected health information may have been accessed, acquired, used, or disclosed to a third party.
>
> ***
>
> **What Happened**
>
> Like other health plans, Blue Shield historically used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites. We were doing this to improve the services we provide to our members.
>
> On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns targeted back to you. We want to reassure you no bad actor was involved, and, to our knowledge, Google has not used your information for any purpose other than these ads or shared your protected information with anyone.
>
> Blue Shield severed the connection between Google Analytics and Google Ads on its websites in January 2024. We have no reason to believe that any member data has been shared from Blue Shield's websites with Google after the connection was severed. Upon discovering the issue, Blue Shield immediately initiated a review of its websites and security protocols to ensure that no other analytics tracking software is impermissibly sharing members' protected health information.

> **What Information Was Involved**
>
> The information that may have been impacted includes the following:
>
> Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for your online account; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a Doctor" search criteria and results (location, plan name and type, provider name and type).

**B. Defendant's Privacy Policies and Promises.**

25. Defendant's privacy policies represent to Plaintiffs and Class Members that it will keep their PII/PHI private and confidential, and it will only disclose PII/PHI under certain circumstances.[2] None of these apply here.

26. Defendant's Notice of Privacy Practices explains Defendant's legal duties with respect to PII/PHI, and the purposes for which Defendant can lawfully use and disclose Plaintiffs' and Class Members' PII/PHI, as follows:[3]

- Treatment;
- Payment;
- Healthcare operations;
- Disclosures to others involved in [patient's] health care;
- Disclosures to [patient's] plan sponsor;
- Disclosures to vendors and accreditation organizations;
- Communications [to patient];
- Health or safety;
- Public health activities;
- Health oversight activities;
- Research [as allowed by law];
- Compliance with the law;
- Judicial and administrative proceedings;

[2] https://www.blueshieldca.com/content/dam/bsca/en/provider/documents/2024/guidelines-resources/PRV_Privacy-Practices-C18305-5-21-REF447117-XLOB.pdf (last accessed May 01, 2025).

[3] *Id.*

- Law enforcement officials;
- Government functions; and
- Workers' compensation.

27. Defendant's privacy policy does not permit Defendant to intercept and disclose Plaintiffs' and Class Members' PII/PHI to third parties, including Google, for marketing purposes, without their consent.

**C. BSC's Use of Google Analytics.**

28. Until January 2024, BSC used Google Analytics, a web analytics service that allows website owners to track visitor actions on the Website and target them with personalized advertisements. The code for Google Analytics was embedded on the main pages, subpages, and those pages accessed after a health care account user enters a username and password. Google Analytics tracking is also present when a person performs the same functions through BSC's mobile app, as well as through the Website.

29. The tracking technologies transmit to Google, and potentially other companies, contemporaneously with the communications between Class Members and BSC, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the Website, and personal medical information the user enters into the forms on the Website.

30. Generally, tracking technologies work as follows: a website owner inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server. That JavaScript code is then executed automatically within the individual's web browser. This code, often referred to as a tracking code or tag, begins to collect and communicate certain information to the third-party website.

31. Specifically, Google Analytics works as follows: When a user loads the main landing page for the BSC Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The Website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When

the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

32. Such tracking code can include a wide array of metrics; for example, the data includes, but is not limited to: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.blueshield.ca/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

33. Significantly, when the JavaScript code causes the user's web browser to communicate the above-described information to third-party servers, such as Google, that code also causes the browser to reveal the Website user's IP address. Google then uses that IP address to associate the user's communications with the Website with individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account).

34. Moreover, by communicating information about the Website user's browser configuration and device, Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the BSC Website are the same.[4]

35. After Google associates the Website user's communications with BSC with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned

---

[4] In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 % of all users. *See*, Yinzhi Cao, Song Li, Erik Wijmans, (Cross-Browser Fingerprinting via OS and Hardware Level Features, Proceedings of the Network and Distributed Security Symposium, March 2017 (http://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf). (last accessed April 29, 2025).

by Google or any other third parties that use Google's advertising platforms (many do). Thus, PII/PHI becomes included in Google's "digital dossier" on that person.

36. Broadly speaking, any disclosure of the user's IP address and other data permits third parties to associate the information it has received about the individual's communications with the Website to the identity of a particular known individual. A third party can then add the content of the user's communications with BSC to its collection of information it already has about the individual, which it can then use for advertising purposes.

37. In the article "How Google Analytics Breaches Patient Privacy: Case Studies and Solutions," it is noted that "Google Analytics aggregates user data into profiles, which can then be used for various purposes, including targeted advertising. This practice, while beneficial for businesses seeking to personalize user experiences, can be problematic in the healthcare sector, where patient confidentiality is important. The risk of re-identification, where anonymized data is matched with other data sources to identify individuals, poses a significant threat to patient privacy."[5]

38. Significantly, the code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. The tracking technologies are detectible only by using specialized tools (*e.g.* developer software such as Google's "Developer Mode") that divulge the code underlying a webpage and the network traffic the website components generate. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

39. In terms of how Google Analytics interfaces with Google Ads, during the relevant time period and until May 1, 2023, Google offered a "Similar Audiences" feature (which has been replaced with Optimized Targeting and Audience Expansion) in order to target ads to specific groups of users based on their website activity.

40. Google Analytics embedded on BSC's Website collected data about user behavior, which could be used, and upon information and belief was used, to create segments and similar audiences for use in Google Ads.

---

[5] *See*, Anthony Ezidro II, "How Google Analytics Breaches Patient Privacy: Case Studies and Solutions," in Patient10x (2025) (https://www.patient10x.com/content-hub/how-google-analytics-breaches-patient-privacy-case-studies-and-solutions) (last accessed April 29, 2025).

> You can add the new tag to every page in your site. The code tells Google Ads to add every site visitor to your segment. ***When people visit your homepage, for example, the cookies associated with their browsers are added to the segment***.
>
> Once the tag is added to your site, you can add the segment that includes your website visitors and app users to your existing campaigns and ad groups, and raise and lower your bids for these potential customers.[6] [emphasis added]

41. Google explains to its marketing and developer clients that, in order for Google Analytics to determine that two distinct hits belong to the same user, a unique identifier associated with that particular user must be sent with each hit.[7]

42. Specifically, the analytics.js library accomplishes this via the Client ID field, a unique, randomly generated string that gets stored in the browser's cookies, so subsequent visits to the same site can be associated with the same user.[8]

43. By default, analytics.js uses a single, first-party cookie named _ga to store the Client ID, but the cookie's name, domain, and expiration time can all be customized. Other cookies created by analytics.js include _gid, AMP_TOKEN and _gac_<property-id>. These cookies store other randomly generated ids and campaign information about the user.[9]

44. For example, when a patient clicks on a link to a particular doctor, the code that is generated related to Google Analytics shows: the doctor's name, and various cookies that Google uses to track individual users. The doctor's specialty is readily available on Defendant's Website, so by conveying this information, Google Analytics makes it easy to identify the medical condition for which the user is seeking a doctor. The Google Analytics cookies in the code generated by the search include strings beginning with "gid" and "cid" (Google Analytics' "Client ID") cookie, followed by strings of unique numbers Google uses to identify to the user's device.

---

[6] *See*, Google Ads Help, About Your Data Segments For Search (https://support.google.com/google-ads/answer/2701222?hl=en#:~:text=How%20to%20set%20up%20your,who%20make%20up%20your%20segment) (last accessed April 30, 2025).

[7] *See*, Google Analytics, How Users Are Identified For User Metrics (https://support.google.com/analytics/answer/2992042?hl=en) (last accessed April 30, 2025).

[8] *See*, Julius Fedorovicius, A Guide to Google Analytics Client ID blog post at (https://www.analyticsmania.com/post/google-analytics-client-id/#:~:text=The%20client%20ID%20is%20stored,by%20using%20cross%2Ddomain%20tracking.) (last accessed April 30, 2025).

[9] *Id*.

45. On the portions of the Website that are reached after a policyholder enters their password, the Google tracking code that Defendant embedded similarly informs Google of each page that a member clicks on.

**D. IP Addresses and Browser Fingerprints are Personally Identifiable Information.**

46. The Google Analytics embedded in BSC's Website collected IP addresses of Plaintiffs, Class Members, and individual Internet users to facilitate and track Internet communications. It also collected various cookie-related user identifiers that allow it to link transactions on BSC's Website to individual users for purposes of targeted advertising.

47. An IP address is a number that identifies the address of a device connected to the Internet. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to track Internet communications. IP addresses constitute personally identifiable information.

48. Likewise, tracking pixels can collect browser fingerprints from Website visitors and browser fingerprints are considered personal identifiers.

49. Under HIPPA, both IP addresses and browser fingerprints are considered personally identifiable information:

a. HIPPA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See*, 45 C.F.R. § 164.514(b)(2)(i)(M),(R).

b. HIPPA further declares information as personally identifiable where the covered entity has actual knowledge that the information could be used alone or in combination to identify an individual who is a subject of the information. *See*, 45 C.F.R. § 164.514(b)(2)(ii).

## V. DEFENDANT'S VIOLATIONS

50. As described herein, BSC's disclosure of consumer healthcare information was unwarranted and improper. Defendant violated its own policy by unlawfully intercepting and disclosing Plaintiffs' and Class Members' PII/PHI to Google and third parties without adequately disclosing that it shared PII/PHI with third parties and without acquiring the specific patient's consent or authorization to share said PII/PHI.

**A. Federal Warning on Tracking Codes on Healthcare Websites.**

51. Beyond Defendant's own policies and Google's, the government issued guidance warning that tracking code like Google Analytics may come up against federal privacy law when installed on healthcare websites. For example, the statement entitled, "USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES" (the "Bulletin"), was recently issued by the Department of Health and Human Services' Office for Civil Rights ("OCR").[10]

52. Healthcare organizations regulated under the Health Insurance Portability and Accountability Act ("HIPAA") may use third-party tracking tools, such as Google Analytics, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' protected health information to these vendors. The Bulletin explains:

> ***Regulated entities*** [those to which HIPAA applies] ***are not permitted to use tracking technologies*** in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.[11] [emphasis added]

53. The bulletin discusses the types of harm that disclosure may cause the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. ***Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule***.[12] [emphasis added]

---

[10] *See*, HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (https://www.hhs.gov/hipaa/for-professionals/privacyguidance/hipaa-online-tracking/index.html) (last accessed April 30, 2025).

[11] *Id*.

[12] *Id*.

54. Here, Plaintiffs and Class Members are exposed to those exact same risks about which the government warned. Through tracking technology, Defendant passed along Plaintiffs' and Class Members' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the names of their doctors; the frequency with which they reach out to obtain healthcare for specific health and medical conditions; and where they seek health and medical treatment. This information is, as described by the OCR in its bulletin, "highly sensitive."

55. The government's view of such protected information, per the Bulletin, is clear about how broadly that information is protected. It explains: "This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an ***individual's IP address*** or geographic location, medical device IDs, or ***any unique identifying code***."[13] [emphasis added]

56. Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] ***collected on a regulated entity's website or mobile app generally is PHI***, ***even if*** the individual ***does not*** have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. ***This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated enti****ty* (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[14] [emphasis added]

As such, this is further evidence that the data BSC chose to share is protected PII/PHI and was in violation of Plaintiffs' and Class Members' rights.

**B. Defendant's Violation of HIPAA.**

57. Defendant's disclosure of Plaintiffs' and Class Members' PII/PHI to Google and potentially other third parties also violated HIPAA. HIPAA provides an independent reason why Plaintiffs and Class Members would believe that the information they communicated to Defendant through its Website would be protected, rather than shared with third parties for marketing. Moreover, Defendant's violation of HIPAA is a violation of law that forms one of the bases of its violation of California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq*.

---

[13] *Id*.

[14] *Id*.

58. Under federal law, a health insurance company may not disclose personally identifiable, nonpublic medical information about a patient, potential patient, or household member of a patient without the patient's express written authorization. *See*, HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502 (prohibiting disclosure of protected health information); 164.508(a)(3), 164.514(b)(2)(i).

59. HIPAA's Privacy Rule defines individually identifiable health information ("IIHI") as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

60. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of eighteen (18) identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources to identify a single individual.[15]

61. Under the HIPAA de-identification rule, "health information is not individually identifiable only if: (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514. The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." Id. Additionally, the covered entity must not "have actual knowledge that the information could be used

---

[15] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual) (last accessed April 30, 2025).

alone or in combination with other information to identify an individual who is a subject of the information."

62. The HIPAA Privacy Rule requires any "covered entity" - which includes health insurance companies—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

63. An individual's status with a particular entity is PHI. The Department of Health and Human Services instructs covered entities that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[16]

64. BSC improperly disclosed to third parties Plaintiffs' and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit Google, third parties, and others to identify the individual. BSC disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as BSC policyholders, provider information, and appointment information, among others.

65. Defendant BSC's placing of the third-party tracking code on its Website is a violation of Plaintiffs' and Class Members' privacy rights under federal law. While Plaintiffs do not bring a claim under HIPPA itself, this violation demonstrates Defendant's unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

**C. Defendant's Violation of the FTC Act.**

66. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") in July 2023 published a

---

[16] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual). (last accessed April 30, 2025).

bulletin entitled, "Protecting the Privacy of Health Information: A baker's dozen takeaways from FTC cases" that provided key takeaways from its health-related enforcement actions and joined the HHS in warning healthcare companies against using tracking technologies.[17]

67. That same year, the FTC and HHS' Office for Civil Rights sent joint letters to approximately 130 hospital systems and telehealth providers cautioning them about the associated privacy and security risks related to the use of online tracking technologies, such as the Facebook/Meta pixel, integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties. As the FTC explained, "These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app."[18]

68. Thus, the federal government takes violations of heath data privacy and security seriously, as reflected in the several high-profile FTC settlements with healthcare providers.

**D. Defendant was Enriched and Benefitted from the Use of Tracking Technologies.**

69. The sole purpose of the BSC's use of Google Analytics on its Website was marketing and profits.

70. In exchange for disclosing the PII/PHI of its patients, BSC is benefitted by third parties, like Google, in the form of enhanced advertising services and more cost-efficient marketing.

71. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

72. Upon information and belief, as part of its marketing campaign, Defendant re-targeted healthcare consumers and potential policyholders, including Plaintiffs and Class Members.

73. By utilizing the Google Analytics, the cost of Defendant's advertising and retargeting was reduced, thereby benefitting and enriching Defendant.

74. Moreover, Plaintiffs' and Class Members' PII/PHI had value and Defendant's disclosure, and interception harmed Plaintiffs and the Class.

---

[17] https://www.ftc.gov/system/files/ftc_gov/pdf/2024.03.21-PrivacyandDataSecurityUpdate-508.pdf (describing enforcement actions brought against, *e.g.*, BetterHelp, GoodRx Holding, Inc., Premom, and Flo Health entities due to consumer website and mobile app tracking, including Facebook and Google Analytics technologies) (last accessed May 13, 2025).

[18] *Id.*, p. 29.

75. The value of health data in particular is well-known and has been reported on extensively in the media. For example, medical data is even more valuable than personal information, such as credit card numbers which can be quickly changed, because medical data is static. This is why companies possessing medical information are targeted by cyber-criminals.[19]

76. Medical records are even worth more than a SSN, credit card, and driver's license combined, according to federal officials. They estimate that medical records can go for anywhere between $250 to $1,000.[20] Thus, Plaintiffs and Class Members private information has a distinct, high value – which is why legitimate companies and criminals seek to obtain and sell it.

## VI. PLAINTIFFS' EXPERIENCES

### A. Plaintiff J.T.

77. Plaintiff J.T. ("Plaintiff J.T.") has been insured by BSC and used BSC services for several years intermittently, and most recently for the last two years.

78. As a member of BSC's insurance plan, and in order to obtain medical treatment and insurance services, Plaintiff J.T. accessed and used BSC Website on his (computer and on the App).

79. Plaintiff J.T. received an email with the Notice of Data Breach, from Defendant on April 10, 2025, informing him about the privacy breach described throughout this Complaint.

80. As a member of BSC's health insurance plan, and to obtain medical treatment and insurance services, Plaintiff J.T. accessed and used BSC Website, both in its traditional desktop layout and mobile App formats. Specifically, Plaintiff J.T. used the Member Login, Blue Shield claims, and Payment portal webpages most frequently.

81. Further, Plaintiff J.T. used the Website's Find-A-Doctor feature to search for specialized doctors. Plaintiff J.T. also recalls using BSC's Website's open-field search text box. Plaintiff J.T. also used BSC's Website to schedule doctor appointments.

---

[19] *See, Your medical record is worth more to hackers than your credit card,* Reuters, September 24, 2014, https://www.reuters.com/article/technology/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I/), (last visited May 13, 2025).

[20] *See, WPRI, RI hospitals fight cyberattacks on 'almost a daily basis,'* Oct. 10, 2023. (https://www.wpri.com/target-12/ri-hospitals-fight-cyberattacks-on-almost-a-daily-basis/),

**B. Plaintiff E.H.**

82. Plaintiff E.H. ("Plaintiff E.H.") was insured by BSC and used BSC services from January 2017 through January 2020.

83. As a member of BSC's health insurance plan, and to obtain medical treatment and insurance services, Plaintiff E.H. accessed and used BSC Website, both in its traditional desktop layout and mobile App formats. Specifically, Plaintiff E.H. used the Member Login, Blue Shield claims, and Payment portal webpages most frequently.

84. Further, Plaintiff E.H. used the Website's Find-A-Doctor feature to search for specialized doctors dealing with surrogacy and maternal-fetal medicine, along with researching questions related to medical procedures and pregnancy information. Plaintiff E.H. also recalls using BSC's Website's open-field search text box. Plaintiff E.H. also used BSC's Website to schedule doctor appointments.

85. During the relevant time period, Plaintiff E.H. also maintained a Google email account.

86. Plaintiff E.H. received an email with the Notice of Data Breach dated April 7, 2025, from Defendant on April 9, 2025, informing her about the privacy breach described throughout this Complaint.

**C. Injuries to Plaintiffs and Class Members.**

87. Plaintiffs and Class Members reasonably expected that – as a health plan member seeking medical treatment and services – their PII/PHI and communication were confidential and would not be received by Google or other unknown third parties, or used for marketing purposes, without their express written consent. This was not the case.

88. Plaintiffs and Class Member have suffered or at increased risk of suffering from, inter alia, the loss of the opportunity to control how their PII/PHI is used, the diminution in the value, and/or use of their PII/PHI entrusted to Defendant, and loss of privacy.

89. As identified by the United States Department of Health and Human Services, Plaintiffs and Class Members have suffered and continue to suffer various injuries due to the disclosure of their PII/PHI because "an impermissible disclosure of PHI may result in identify theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses,

frequency of visits to a therapist or other health care professionals, and here an individual seeks medical treatment." [21]

90. The risk to Plaintiffs' and Class Members' privacy is ongoing in nature because the PII/PHI that Google, along with any other subsequent recipient third parties, received can be used for years to come.

## VII. CLASS ACTION ALLEGATIONS

91. Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, as representatives of the following Classes:

> **Nationwide Class**: All United States residents whose PII and/or PHI were disclosed to Google or other third parties as a result of their use of Defendant BSC's Website, during the Class Period (the "Class" or "Class Members").
>
> **California Subclass**: All California residents whose PII and/or PHI were disclosed to Google or other third parties as a result of their use of Defendant BSC's Website, during the Class Period (the "California Subclass" or "California Subclass Members").

Together, the Nationwide Class and California Subclass are collectively referred to as "the Class" and "Class Members" unless otherwise specified.

92. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

93. Excluded from the Classes are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also excluded are Judges and Court personnel in this case and any members of their immediate families.

94. Plaintiffs reserve the right to modify, change, or expand the definitions of the proposed Class based upon discovery and further investigation.

95. All requirements of class certification under Fed. R. Civ. P. 23(a), 23(b)(2), (b)(3), and (c)(4) are satisfied.

---

[21] *See*, HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (https://www.hhs.gov/hipaa/for-professionals/privacyguidance/hipaa-online-tracking/index.html) (last accessed April 30, 2025).

96. **Numerosity**. The Class is so numerous that joinder of all members would be impracticable. While Plaintiffs do not know the exact number of Class Members, BSC issued a Notice of Data Breach to 4.7 million members.[22] Upon information and belief, Plaintiffs thus allege that the number of Class Members is over one million. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

97. **Commonality and Predominance**. This action involves common questions of law and fact to the Plaintiffs and Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

a. Whether BSC enabled Google Analytics or other tracking code on its Website and thereby allowed Google and any other third party to intercept, track, transmit, collect, and store Plaintiffs' and Class Members' PII/PHI;

b. Whether BSC enabled Google Analytics to intercept, track, transmit, collect, and store, Plaintiffs' and Class Members' PII/PHI without full knowledge and consent;

c. Whether BSC otherwise supplied Plaintiffs' and Class Members' PII/PHI to Google and any other third parties, without the Plaintiffs' and Class Members' knowledge and consent;

d. Whether Defendant owed Plaintiffs and Class Members a duty to secure their PII/PHI from disclosure via third party tracking technologies;

e. Whether Defendant owed Plaintiffs and Class Members a duty to implement reasonable data privacy protection measures because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiffs and Class Members;

f. Whether Defendant knew or should have known of the risk of disclosure of data through third-party tracking technologies;

g. Whether Defendant breached its duty to protect the PII/PHI of Plaintiffs and Class Members;

h. Whether Defendant knew of should have known about the inadequacies of its privacy protections;

---

[22] https://www.techtarget.com/healthtechsecurity/news/366623133/Blue-Shield-of-California-Data-of-millions-shared-with Google#:~:text=Blue%20Shield%20of%20California%20notified%204.7%20million,to%20the%20impacted%20members%2C%20Blue%20Shield%20stated.

i. Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiffs' and Class Members' PII/PHI from unauthorized disclosure;

j. Whether proper data security measures, policies, procedures and protocols were enacted within Defendant's computer systems to safeguard and protect Plaintiffs' and the Class Members' PII/PHI from unauthorized disclosure;

k. Whether Defendant's conduct was the proximate cause of Plaintiffs' and the Class's injuries;

l. Whether Plaintiffs and the Class had a reasonable expectation of privacy in their PII/PHI;

m. Whether Plaintiffs and the Class suffered ascertainable and cognizable injuries as a result of Defendant's misconduct;

n. Whether Plaintiffs and the Class are entitled to recover damages; and

o. Whether Plaintiffs and the Class are entitled to other appropriate remedies including injunctive relief.

98. Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Class(es). Individual questions, if any, are slight by comparison in both quality and quantity to common questions that control this action.

99. **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII/PHI, like that of every other Class Member, was improperly disclosed by Defendant. Class Members were injured and suffered damages in substantially the same manner as Plaintiffs, Class Members have the same claims against Defendant relating to the same course of conduct, and Class Members are entitled to relief under the same legal theories asserted by Plaintiffs.

100. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the proposed Class(es) and have no interests antagonistic to those of the proposed Class(es). Plaintiffs have retained counsel experienced in the prosecution of complex consumer class actions including, but not limited to, privacy and data breach class actions. Plaintiffs intend to prosecute this action vigorously and have no adverse or antagonistic interests to those of the Class(es).

101. **Predominance**. Questions of law or fact common to the proposed Class predominate over any questions affecting only individual members. Common questions such as whether Defendant

owed a duty to Plaintiffs and the Class and whether Defendant breached its duties predominate over individual questions.

102. **Superiority and Manageability**. A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of the Class is impracticable. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual patients like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

103. Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate because Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

104. Class Certification under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class will predominate over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

105. Particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## VIII. CAUSES OF ACTION

### COUNT ONE

### VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT

### (18 U.S.C. § 2511(1), *et seq.* ("ECPA"))

### (On Behalf of Plaintiffs and the Nationwide Class)

106. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

107. The Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

108. The communications between Plaintiffs and other Class Members and BSC through its Website were electronic communications under the ECPA because an individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12).

109. The tracking technologies inserted into the hidden code of BSC's Website, including Google Analytics, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Plaintiffs and Class Members used to access BSC's Website; (ii) Plaintiffs' and Class Members' web browsers used to access the BSC Website; (iii) BSC's own computer and web servers; (iv) the tracking technology code deployed by Defendant to effectuate the interception of Plaintiffs' and Class Members' communications; and (v) the computer servers of third parties such as Google which intercepted Plaintiffs' and Class Members' communications with the BSC Website.

110. The computer code for tracking technologies such as Google Analytics enabled Google and other third parties to record and disclose to Google and other third parties the contents of communications between BSC and users of its Website, including, but not limited to: (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the Website. As a result, Plaintiffs' and Class Members' PII/PHI – including information about health symptoms, medical conditions and potential treatments, and other health-related queries as revealed by full-string URL's constitute "content" under ECPA.

111. As alleged herein, BSC configured both its Website and the tracking technologies, including Google Analytics, in such a manner that revealed the contents of communications between healthcare consumers and BSC, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and BSC), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers.

112. Further, BSC also used tracking technologies on pages that would confirm to third parties such as Google of the user's likely status as BSC policyholders.

113. With respect to Plaintiffs, the tracking technologies revealed information regarding Plaintiffs' status as a BSC policyholder and their communications with BSC regarding their respective

policies by revealing the substance of communications on BSC webpages on the username and password protected Member Login portal.

114. By inserting the computer code for Google Analytics, along with any other tracking technologies, if applicable, BSC intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

115. Additionally, through the above-described tracking technologies, after BSC intercepted communications, the intercepted information was, in turn, used by third parties, such as Google and Google Ads, to: i) place Plaintiffs in specific health-related categories based on their past, present, and future health conditions; and ii) target Plaintiffs with particular advertising associated with their specific health conditions.

116. BSC facilitated the interception of communications between Plaintiffs and the Class Members and BSC, and BSC disclosed such intercepted communications to Google and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception. No valid legal exceptions apply.

117. BSC intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any States - namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this Complaint. Indeed, Defendant's primary purpose for deploying the tracking technologies was to collect data from users secretly, deceptively, and without permission, in violation of users' privacy rights.

118. Because of BSC's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' PII/PHI, Defendant does not qualify for any exemption.

119. As alleged above, BSC violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-(6), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

120. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that - (A) is created or received by a health care provider...(B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there

is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

121. Guidance issued by the Department of Health and Human Services confirms that the type of online tracking technologies deployed by Defendant violates HIPPA. HIPPA prohibits disclosing patients' health information via tracking technologies on both user-authenticated webpages (such as the log-in portal) and unauthorized webpages. The guidance includes IP addresses, device IDs, and unique identifying codes collected on a regulated entity's website in the definition of IIHI.

122. As described above, Plaintiffs and Class Members entered data on Defendant's website relating to their private health and medical issues and some subsequently received advertisements from BSC. This shows that through the tracking technologies employed, Defendant disclosed Plaintiffs' and Class Members' individually identifiable health information to third parties in violation of the ECPA.

123. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communications.

124. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purpose of invading Plaintiffs' privacy via tracking technologies. Nor did Plaintiffs and Class Members consent to the disclosure of their sensitive medical information to unauthorized third parties.

125. Plaintiffs' and Class Members' PII/PHI that BSC disclosed to third parties qualifies as IIHI, and BSC violated Plaintiffs' and Class Members' expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d-(6). BSC used the intercepted electronic communications to increase its revenues.

126. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42

127. U.S.C. § 1320d-6. BSC specifically used tracking technologies to intercept and disclose Plaintiffs' and Class Members' PII/PHI for financial gain.

128. BSC's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Google and potentially other third parties without patient authorization.

129. BSC's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because BSC's use of the Google Analytics source code was for BSC's commercial advantage to increase revenue from existing policyholders and gain new membership.

130. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

131. Pursuant to the ECPA, Plaintiffs seek for themselves and for each Class Member statutory damages of $100 for each day of BSC's violation of the ECPA for Plaintiffs and for each Class Member, or $10,000 with respect to the Plaintiffs and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that their counsel has incurred and will reasonably incur in prosecuting this action.

## COUNT TWO

## INVASION OF PRIVACY – INTRUSION UPON SECLUSION

## (On Behalf of Plaintiffs and the Nationwide Class)

132. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

133. The PII/PHI of Plaintiffs and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

134. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

135. Defendant owed a duty to Plaintiffs and Class Members to keep their PII/PHI confidential.

136. The unauthorized disclosure and/or acquisition by a third party of Plaintiffs' and Class Members' PII/PHI via the use of the Google Analytics by Defendant is highly offensive to a reasonable person.

137. State and federal judges have expressed similar sentiments, finding similar allegations stated privacy claims that require conduct that would be considered "highly offensive" to a reasonable person. *See, e.g., In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022); *Opperman v. Path*, 87 F. Supp. 3d 1018, 1060–61 (N.D. Cal. 2014) (finding that a jury must decide whether the "surreptitious theft of personal contact information" is highly offensive); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606 (finding that highly offensive

element was sufficiently pleaded where Facebook collected full-string detailed URLs and where "Plaintiffs have alleged that internal Facebook communications reveal that the company's own officials recognized these practices as a problematic privacy issue.") The disclosure is also highly offensive because it violates HIPAA and regulatory guidance.

138. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' PII/PHI constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

139. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Google's simultaneous eavesdropping and wiretapping of confidential communications.

140. Defendant failed to protect Plaintiffs' and Class Members' PII/PHI and acted knowingly when it incorporated the PII/PHI into its Website because it knew the functionality and purpose of the tracking code.

141. Because Defendant intentionally and willfully incorporated Google Analytics into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

142. As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI, Plaintiffs and Class Members suffered and continue to suffer harm and injury, including loss of privacy associated with disclosure of their sensitive health and medical data and the loss of the benefit of the bargain.

143. Had Plaintiffs and Class Members known that Defendant secretly disclosed their PII/PHI to third parties - including Google - they would have used the services of another insurance provider or paid a lower price for Defendant's services.

144. Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

## COUNT THREE

## INVASION OF PRIVACY – PUBLICATION OF PRIVATE FACTS

**(On Behalf of Plaintiffs and the Nationwide Class)**

145. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

146. A claim for invasion of privacy by publication of private facts requires that (1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person.

147. Through Defendant's code embedded on its Website, Defendant gathered up information about Plaintiffs' and Class Members' medical conditions, prescriptions, physician information, and other private data, including healthcare search terms, live chats, and links accessed. All of that information is either linked or linkable by unauthorized third parties, including Google, to individualized Plaintiffs and Class Members due to the unique identifiers, cookies, and codes used.

148. Defendant's conduct in deploying the tracking code from Google on its Website resulted in the publication of private facts to one of the largest digital advertising companies in the world, Google Ads. On information and belief, Google aggregated Plaintiffs' and Class Members' personal and highly sensitive medical data for purposes of selling targeted advertising and/or otherwise monetizing the data in the broader data marketplace, consistent with their business models, resulting in the widespread publication of Plaintiffs' and the Class's data.

149. Plaintiffs' and Class Members' communications of PII/PHI regarding health symptoms, medical conditions, potential treatments, and other health-related inquiries were private and intended only for themselves and Defendant.

150. Defendant's publication of Plaintiffs' and Class Members' PII/PHI obtained via the Website is highly offensive to a reasonable person because the tracking was entirely surreptitious, and the disclosures relate to healthcare consumers most sensitive personal information, including information about specific symptoms, conditions, and treatments. The disclosure is also highly offensive because it violates HIPAA and regulatory guidance.

151. As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PII/PHI, Plaintiffs and Class Members suffered and continue to suffer harm and injury, including loss of privacy associated with disclosure of their sensitive health and medical data and the loss of the benefit of the bargain. Had they known that Defendant secretly disclosed their PII/PHI to third parties - including Google - they would have used the services of another insurance provider or paid or demanded a lower price for Defendant's services.

152. Plaintiffs and the Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

**COUNT FOUR**

**BREACH OF IMPLIED CONTRACT**

**(On Behalf of Plaintiffs and the Nationwide Class)**

153. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

154. When Plaintiffs and Class Members provided their user data to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their PII/PHI without consent.

155. Moreover, there is a covenant of good faith and fair dealing implied in every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives its own interests.

156. Plaintiffs and Class Members accepted Defendant's offers and provided their PII/PHI to Defendant.

157. Plaintiffs and Class Members would not have entrusted Defendant with their PII/PHI in the absence of an implied contract between them and Defendant obligating Defendant to not disclose PII/PHI without consent.

158. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' PII/PHI to third parties, e.g., Google and other downstream third-party businesses.

159. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Defendant's services, or would have paid substantially less for these services, had they known their PII/PHI would be disclosed.

160. Plaintiffs and Class Members are entitled to nominal, compensatory, and consequential damages as a result of Defendant's breaches of implied contract.

**COUNT FIVE**

**UNJUST ENRICHMENT**

**(On Behalf of Plaintiffs and the Nationwide Class)**

161. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

162. Plaintiffs and Class Members provided their PII/PHI to Defendant for the purposes of receiving healthcare services or healthcare-related information and knowledge. Defendant receives a benefit from its use of Plaintiffs' and the Class Members' PII/PHI, including costs savings for

marketing and advertising and increased profits from the acquisition of new policyholders and existing policyholders seeking more services. Defendant intentionally collected and used Plaintiffs' and the Class Members' PII/PHI for its own gain, without consent or authorization.

163. The Website's interception, collection, use, and disclosure of Plaintiffs' and Class Members' PII/PHI, and the benefits, revenues, and profits resulting therefrom – including BSC's own use of the PII/PHI on its servers to create and/or modify its marketing, along with that of Google and Google Ads use(s) in exchange for fees from Defendant and/or other downstream third party businesses, means that Defendant obtained benefits, revenues, and/or profits from the data.

164. In other words, Plaintiffs and Class Members conferred a benefit upon Defendant in the form of the monetizable PII/PHI that Defendant collected and disclosed to third parties, including Google, without authorization and proper compensation.

165. Defendant unjustly retained those benefits at the expense of Plaintiffs and the Class Members and this conduct damaged Plaintiffs and the Class Members. Plaintiffs and the Class Members were not compensated by Defendant for the data they provided.

166. It would be inequitable and unjust for Defendant to retain any of the profit or other benefits derived from the secret, unfair, and deceptive data tracking methods Defendant employs on its Website.

167. The Court should require Defendant to disgorge all unlawful or inequitable proceeds that it received into a common fund for the benefit of Plaintiffs and Class Members, and order other such relief as the Court may deem just and proper.

168. Plaintiffs allege this claim in the alternative in the event Plaintiffs and Class Members have an inadequate remedy at law.

## COUNT SIX

## BREACH OF CONFIDENCE

## (On Behalf of Plaintiffs and the Nationwide Class)

169. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

170. Plaintiffs and Class Members had a reasonable expectation of privacy in the responses and communications entrusted to BSC through its Website, which included highly sensitive PII/PHI. BSC's policies bolstered that expectation, given its false promises to Plaintiffs and Class Members

that it would collect website activity information only for "internal purposes" and not to benefit third parties.

171. Moreover, Plaintiffs and Class Members had a reasonable expectation of privacy and that the user's Website communications could not be linked back to individualized PII/PHI – but tracking technologies are designed to do precisely that.

172. In light of the special relationship between BSC and Plaintiffs and Class Members, whereby BSC became a guardian of Plaintiffs' and Class Members' PII/PHI, BSC had a duty to: (1) safeguard of Plaintiffs' and Class Members' PII/PHI; (2) timely notify Plaintiffs and Class Members of disclosure of their PII/PHI to unauthorized third parties; and (3) maintain complete and accurate records of what healthcare consumer, policyholder, and/or patient information (and where) BSC did and does store and disclose.

173. Healthcare insurers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information based on the trust and confidence Plaintiffs and Class Members reposed in BSC to handle Plaintiffs' and Class Members' confidential communications appropriately.

174. Healthcare insurers like BSC also have a duty to maintain the confidentiality of Plaintiffs' and Class Members' PII/PHI under HIPAA and its implementing regulations, along with FTC guidelines.

175. When possessing nonpublic medical information, health insurers such as BSC have a duty to keep such information completely confidential.

176. Contrary to its duties as a health insurer and its express and implied promises of confidentiality, BSC installed tracking technologies that disclosed and transmitted to third parties Plaintiffs' and Class Members' communications with BSC and the contents of those communications, including PII/PHI.

177. BSC made these disclosures for its own commercial and marketing purposes without Plaintiffs' or Class Members' knowledge, consent, or authorization.

178. The unauthorized disclosures of Plaintiffs' and Class Members' PII/PHI were intentionally caused by BSC's employees acting within the scope of their employment.

179. Alternatively, the disclosures of Plaintiffs' and Class Members' PII/PHI occurred because of BSC's negligent hiring or supervision of its employees or agents, its failure to establish

adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

180. BSC disclosed Plaintiffs' and Class Members' PII/PHI to third parties in a manner that allowed them to identify the Plaintiffs and the individual Class Members.

181. The harm arising from BSC's breach of confidentiality includes eroding the essential confidential relationship between the healthcare insurer and the consumer.

182. Accordingly, Plaintiffs, individually and on behalf of members of the Class, seeks compensatory damages, plus costs and attorneys' fees.

## COUNT SEVEN

## INVASION OF PRIVACY/INTRUSION UPON SECLUSION

## (California Constitution, Art. 1, § 1)

## (On Behalf of Plaintiffs and the California Class)

183. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

184. Plaintiffs and Class Members have a legally protected privacy interest in the PII and PHI that they enter into Defendant's Website and are entitled to the protection of their information and property against unauthorized access.

185. Plaintiffs and Class Members reasonably expected that their PII/PHI would be protected and secure from unauthorized parties, and that it would not be disclosed to any unauthorized parties or disclosed for any improper purpose.

186. Defendant unlawfully invaded the privacy rights of Plaintiffs and Class Members by: (a) disclosing their private, and personal information to unauthorized parties in a manner that is highly offensive to a reasonable person; and (b) disclosing their private and personal information to unauthorized parties without the informed and clear consent of Plaintiffs and Class Members, including but not limited to including the Google and other tracking code on its Website that transfer information entered and records of actions taken by patients on Defendant's Website to unrelated entities. This invasion into the privacy interest and seclusion of Plaintiffs and Class Members is serious and substantial.

187. In willfully sharing Plaintiffs' and Class Members' PII/PHI, Defendant acted in reckless disregard of their privacy rights.

188. Defendant violated Plaintiffs' and Class Members' right to privacy under California law, including, but not limited to California common law and Article 1, Section 1 of the California Constitution and the California Consumer Privacy Act.

189. Defendants' intrusion was substantial and unreasonable and led to the unwanted exposure of Plaintiff and the Class Members' private affairs and information.

190. As a direct and proximate result of Defendant's unlawful invasions of privacy, Plaintiffs' and Class Members' private, personal, and confidential information has been accessed or is at imminent risk of being accessed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiffs and proposed Class Members have suffered injuries as a result of Defendant's unlawful invasions of privacy and are entitled to appropriate relief.

191. As a direct and proximate result of Defendants' intrusion, Plaintiff and the Class Members have suffered damages including, but not limited to, increased risk of identity theft, becoming the targets of increased and unwanted marketing and advertising campaigns, and an invasion of their privacy in an amount to be ascertained at trial.

192. Plaintiffs and Class Members are entitled to injunctive relief as well as actual and punitive damages.

## COUNT EIGHT

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT

## (Cal. Penal Code §§ 630, 631 *et seq*. ("CIPA"))

## (On Behalf of Plaintiffs and the California Class)

193. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

194. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

195. CIPA's stated purposes is to protect the privacy of the people of the State of California while acknowledging that "[a]dvances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *See*, Cal. Pen. Code § 630.

196. California Penal Code § 631(a) provides a remedy against, *inter alia*:

> ***Any person who…intentionally taps, or makes any unauthorized connection, whether*** physically, ***electrically,*** …, or otherwise, with any telegraph or telephone wire, line, cable, or instrument … ***or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads***, or attempts to read, or to learn the contents or meaning of any message, report, or communication ***while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state***; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, ***or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section***,

Cal. Pen. Code § 631(a). [emphasis added]

197. Here, Defendant "intentionally tap[ped]…or ma[de] [an] unauthorized connection with respect to Plaintiffs and Class Members communications by placing third party tracking code on its Website, without "the consent of all parties" including Plaintiffs and Class Members, and thereby violated CIPA.

198. Defendant also "aided, employed, agreed with, and conspired with" Google, and other participating third parties as applicable, to track and intercept Plaintiffs' and the Class Members' internet communications while using Defendant's Website. Defendant's conduct allowed unauthorized third parties to read and learn about the contents or meaning of any message, report, or communication from Plaintiffs and the California Class "while the same was in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state [California]."

199. Defendant intentionally inserted an electronic device (the tracking technology code) that, without the knowledge and consent of Plaintiffs and the California Class, recorded and transmitted their confidential communications with Defendant to third parties.

200. Defendant willfully facilitated and aided the interception and collection of Plaintiffs' and the California Class's PII/PHI by embedding the tracking code on the Website.

201. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the tracking code falls under the broad catch-all category of "any other manner":

a. The computer codes and programs Google Analytics used to track Plaintiffs' and the California Class's communications while they were navigating the Website;

b. Plaintiffs' and the California Class's browsers;

c. Defendant's Website and webserver;

d. Plaintiffs' and the California Class's computing and mobile devices;

e. The web and ad servers from Google tracked and intercepted Plaintiffs' and the California Class's communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google to effectuate its tracking and interception of Plaintiffs' and the California Class's communications while they were using a browser to visit the Website; and

g. The plan Defendant and Google, along with any other applicable third parties, carried out to effectuate their tracking and interception of Plaintiffs' and the California Class's communications while they were using a web browser to visit the Website.

202. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiffs and the California Class for the greater of: a) treble actual damages related to their loss of privacy in an amount to be determined at trial; or b) for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

203. Under the statute, Defendant is also liable for reasonable attorneys' fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

204. Based on the foregoing, Plaintiffs and the California Class seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## COUNT NINE

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT

**(Cal. Penal Code § 632 *et seq*. ("CIPA: Pen Register/Trace"))**

**(On Behalf of Plaintiffs and the California Class)**

205. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

206. Cal. Penal Code § 632 provides, in relevant part, that it is unlawful to "intentionally and without the consent of all parties to a confidential communication," "use[] [a] recording device to … record the confidential communication." As used in the statute "'confidential communication'

means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."

207. The written transmission of information about Plaintiffs' and Class Members' searches and clicks on its Website as described above is a recording of those communications. The code is a "recording device."

208. Also relevant here is that Cal. Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

209. The Google Analytics code is a "pen register" and/or "trap and trace device" because it capture and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiffs' and Class Members' computers, computer systems, mobile devices, and computer networks as they access and visit the Website.

210. Defendant did not have Plaintiffs' or Class Members' consent to record their communications.

211. Cal. Penal Code § 637.2(a) provides:

> Any person who has been injured by a violation of this chapter [including Penal Code § 632] may bring an action against the person who committed the violation for the greater of the following amounts:
>
> (1) Five thousand dollars ($5,000) per violation.
>
> (2) Three times the amount of actual damages, if any, sustained by the plaintiff.

212. Cal. Penal Code § 637.2(b) provides that "[a]ny person may…bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek damages as provided by subdivision (a)."

213. Cal. Penal Code § 637.2(c) provides, "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

214. Defendant is therefore liable to Plaintiffs and the Class for, at a minimum, statutory damages of $5,000 per violation, and Plaintiffs and Class Members are also entitled to injunctive relief.

**COUNT TEN**

**VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT**

**(Cal. Civ. Code § 56 *et seq.* ("CMIA"))**

**(On Behalf of Plaintiffs and the California Class)**

215. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

216. The short title of the California Confidentiality of Medical Information Act, California Civil Code § 56, et seq. (hereinafter referred to as the "CMIA") states:

> The Legislature hereby finds and declares that persons receiving health care services have a right to expect that the confidentiality of individual identifiable medical information derived by health service providers be reasonably preserved. It is the intention of the Legislature in enacting this act, to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information.

217. The CMIA provides, at Section 56.10(a), that "a provider of care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

218. Defendant was and is a "health care service plan" within the meaning of Civil Code § 56.06.

219. Plaintiffs and Class Members are members of BSC and, as a health care service plan, BSC has an ongoing obligation to comply with CMIA's requirements with respect to Plaintiffs' and Class Members' confidential medical information.

220. The statute defines "medical information" as:

> [A]ny individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment. "Individually identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual.

*See*, Cal. Civ. Code § 56.05(i).

221. As set forth above, names, addresses, telephone numbers, email addresses, device identifiers, web URLs, IP addresses, city and zip code, and other characteristics that can uniquely identify Plaintiffs and Class Members were transmitted to Google in combination with insurance

information, medical conditions, medical concerns, treatment(s) sought by patients, attempts to pay bills, and other patient searches and queries. This PII/PHI constitutes confidential information under the CMIA.

222. Here, tracking code made possible the linking of a Website user and his or her identity. The information exchanged included the contents of searches and the act of and substance of making appointments with doctors, among others, reveals information about patients' "physical condition or history."

223. Pursuant to the CMIA, the information communicated to BSC and disclosed to Google and other third parties constitute medical information because it is information derived from a health care service plan member regarding a patient's medical treatment and physical condition and is received in combination with individually identifying information. *See*, Cal. Civ. Code §§ 56.05(g) and 56.05(j).

224. As set forth above, Google views, processes, and analyzes the confidential medical information it receives via Google Analytics. Google then uses the viewed confidential information for advertising and marketing purposes.

225. Defendant failed to obtain Plaintiffs' and Class Members' authorization for the disclosure of medical information.

226. Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and…executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or their representative; (3) state the name and function of the third party that receives the information; and (4) state as specific date after which the authorization expires. The information set forth on BSC's Website, including its privacy policies, does not qualify as a valid disclosure or authorization.

227. Defendant violated the CMIA by disclosing healthcare consumers and service plan members' medical information to Google along with their individually identifying information.

228. Plaintiffs and Class Members seek nominal damages, compensatory damages, punitive damages, attorneys' fees, and costs of litigation for Defendant's violation of the CMIA.

**<u>COUNT ELEVEN</u>**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code § 17200, *et seq*.)**

**(On Behalf of Plaintiffs and the California Class)**

229. Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

230. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

231. Defendant engaged in unfair, fraudulent, and unlawful business practices in connection with its provision of Plaintiffs' and Class Members' PII/PHI to unrelated third parties, including Google, in violation of the UCL.

232. As alleged herein, Defendant expressly represented to consumers such as Plaintiffs and Class Members, among other things: that information they entered onto Defendant's Website would not be used for purposes other than those specifically requested by Plaintiffs, such as finding a doctor within Defendant's system or the researching, on Defendant's system, of users' medical conditions. Defendant also omitted or concealed the material fact of that it had installed internet eavesdropping devices, including the Google Analytics, on its webpages. It thus failed to disclose to Plaintiffs and Class Members that it failed to meet legal and industry standards for the protection of PII/PHI and consequently, its users' private property and information.

233. The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

234. Defendant violated the "unlawful" prong of the UCL by violating, *inter alia,* Plaintiff's and Class members' constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes, such as The Electronic Communications Privacy Act, 18 U.S.C. § 2511 ("ECPA"), the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, 632 *et seq*., the California Confidentiality on Medical Information Act ("CMIA"), Cal. Civ. Code § 56 *et seq*., along with the Federal Trade Commission Act ("FTC"), § 5 and the Health Insurance Portability and Accountability Act ("HIPAA"), and as alleged *supa*.

235. Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged herein, offended public policy (including the

aforementioned federal privacy statutes, and state consumer protection statutes, such as ECPA, CIPA, CMIA, FTC, and HIPAA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members.

236. Defendant's acts, omissions, and conduct are also unfair in that California has a strong public policy of protecting consumers' privacy interest, including protecting consumers' personal data. Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise misusing Plaintiffs' and Class Members' personal information and data without Plaintiffs' and Class Members' consent. Defendant's conduct violates the policies and statutes referenced herein.

237. The harm caused by Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate

238. business interests other than Defendant's conduct described herein.

239. By exposing, compromising, and willfully sharing and/or selling Plaintiffs' and Class Members' private property and personal information without authorization, Defendant engaged in a fraudulent business practice that is likely to deceive a reasonable consumer.

240. A reasonable person would not have agreed interact with Defendant's Website had he or she known the truth about Defendant's practices alleged herein. By withholding material information about its practices, Defendant was able to convince customers to use its Website and to entrust their highly personal information to Defendant.

241. As a result of Defendant's violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief.

242. As a result of Defendant's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, e.g., access to their private and personal data. The unauthorized access to Plaintiffs' and Class Members' private and personal data also has diminished the value of that information.

243. In the alternative to those claims seeking remedies at law, Plaintiffs and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful, unfair, and fraudulent practices. Further, no legal remedy exists under Section 5 of the FTC Act (as opposed to, *e.g.*, state little FTC acts like the UCL) and HIPAA. Therefore, Plaintiffs and

members of the proposed Class are entitled to equitable relief to restore Plaintiffs and Class Members to the position they would have been in had Defendant not engaged in unfair competition, including an order enjoining Defendant's wrongful conduct, restitution, and disgorgement of all profits paid to Defendant as a result of its unlawful and unfair practices.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Nationwide Class and California Subclass, and appointing Plaintiffs and their Counsel to represent the Classes;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII/PHI of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. For disgorgement and restitution of all earnings, profits, compensation, and benefits received as a result of the unlawful act, omissions, and practices described herein;

E. For an award of damages, including, but not limited to, compensatory, consequential, general, statutory, nominal, and punitive damages, as allowed by law in an amount to be determined;

F. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G. For prejudgment and post-judgment interest on all amounts awarded; and

H. Such other and further relief as this Court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the instant action.

Dated: May 21, 2025

**CASEY GERRY FRANCAVILLA BLATT LLP**

*/s/Jennifer L. Connor*
David S. Casey, Jr.
Gayle M. Blatt
P. Camille Guerra
Jennifer L. Connor
110 Laurel Street
San Diego, California 92101
Tel: (619) 238-1811
Fax: (619) 544-9232
gmb@cglaw.com
camille@cglaw.com
jconnor@cglaw.com

*Attorneys for Plaintiffs and the Proposed Class(es)*